[LANCASTER, JUNE 1, 1829.]

## The COMMONWEALTH *against* AURAND.

### APPEAL.

Under the provisions of the act of the 30th of *March*, 1811, to amend and consolidate the several acts relating to the settlement of public accounts, &c., it is not necessary that an account should be revised and examined by the state treasurer in person. It may be done by deputy.

APPEAL by the defendant from the decision of ROGERS, J., holding a Circuit Court for *Berks* county. Action of assumpsit. Plea *non assumpsit*. The suit was to recover the alleged amount of militia fines in the hands of the defendant, as late deputy marshal. By act of congress of the 4th of *May*, 1822, all the right of the *United States* to fines assessed upon citizens of the state of *Pennsylvania* for non-performance of militia duty, during the late war, were vested in the said state, to be recovered by the same, under such regulations, provisions, and restrictions, as shall be prescribed by the legislature thereof. Whereupon, by act of assembly of the 1st of *April*, 1823. (*Pamph. Laws*, 1822–3, *page* 274,) the auditor general was " authorized and required to take legal measures to recover all monies in the hands of those who now are, or heretofore have been marshals, or deputy marshals, or which may be in the hands of their legal representatives, which may have been collected from the fines aforesaid, after deducting the expense of assessing and collecting the same; and also to settle and adjust the ac-

(The Commonwealth *v.* Aurand.)

counts of the said marshals and deputy marshals, for monies by them collected as aforesaid, under the provisions of the act of the 30th of *March*, 1811, entitled, ' An act to amend and consolidate the several acts relating to the settlement of the public accounts and the payment of the public monies, and for other purposes,' and for this purpose he is hereby authorized and required, to exercise the same powers for compelling the said marshals and deputy marshals, or their legal representatives, to render their respective accounts, and for procuring the attendance of persons, whether party or witnesses, and the exhibition and delivery of books, accounts, documents, and papers which have any relation to or connexion with the said accounts or fines, and which he may deem necessary in the investigation and adjustment of the same, as are or may be exercised in the case of other debtors or delinquent public officers of this commonwealth: Provided, that no proceedings shall be instituted against them or any of them, previous to the 1st day of *August* next: And provided, also, that in settling and adjusting the accounts aforesaid, the accounting officers shall allow a credit to the several marshals and deputy marshals, for all sums heretofore paid by them to the officers composing the courts martial, held under the authority of the laws of the *United States*, and the laws of the commonwealth of *Pennsylvania*, for the trial of delinquent militia men."

The copy of the account given in evidence, was as follows:—

" *Peter Aurand*, Esq., late deputy marshal for the counties of *Berks* and *Schuylkill*, in account with the commonwealth of *Pennsylvania*, for fines recovered from the citizens of this state for non-performance of militia duty during the late war with *Great Britain.*——Dr.

" To amount of fines recovered in the 2nd Brigade, 6th Division, P. M. List 1,  -   -   -   $14528,00

" To amount of fines recovered in the 95th Regiment, 1st Brigade, 6th Division, per List No. 2,    $3200,00

" To amount of fines recovered in the 143d Regiment, 1st Brigade, 6th Division, per List No, 3,  -  -  -  -  -  -  -  -  $2801,00

$20529,00

Cr.

" By cash paid *John Smith*, Esq., Marshal, per receipt dated 20th of *June*, 21st, 1827, No. 1,  -   -   -   $2000,00

" By cash paid *John Smith*, Esq., Marshal, per receipt dated 22nd of *April*, 1818, No. 2,  -  -  -  -  $5000,00

(The Commonwealth *v.* Aurand.)

" By amount paid to officers of Court
Martial, 2nd Brigade, 6th Division, $5756;95

" By amount paid to officers of Court
Martial, 143d Regiment, 1st Brigade,
6th Division, - - - - $428,51

" By amount paid to officers of Court
Martial, 95th Regiment, 1st Brigade,
6th Division, No. 3, - - $188,59½

" By attorneys' fees on suits brought
against the Deputy Marshal, No. 4, $50,00

" By amount paid for postage, printer's
bills, &c., per No. 5, - - $81,71

" By commissions on $13529,00, at five
per cent, - - - - - $676,45 $14182,21½

Due Commonwealth, - - - - - $6346,78½

" Settled and entered,          Approved and entered.
David Mann.          *A. M. Piper* for *William Clark*,
Auditor General's Office.          Treasurer. Treasury Office,
*November* 1st, 1825.          *November* 1st, 1825.

"*November* 1st, 1825.          Auditor General's Office.

" I certify the foregoing to be a true copy of the original remaining on file in this office.

" Witness my hand and seal of office the day and year aforesaid.

*David Mann.*

" Auditor General."

The verdict was for the commonwealth for damages and interest seven thousand five hundred and seventy-six dollars and ninety-seven cents; his honour, the judge, having decided on the trial, that the account was sufficient to support the action, that the settlement, not having been appealed from, was final and conclusive, and that the same was sufficiently approved and entered at the treasury office. He therefore refused a new trial, which was asked for by the defendant, and this decision was the error complained of.

*Darling*, for the defendant.—The questions are two:—1st, were the accountant officers, in their summary jurisdiction against *Aurand*, bound to proceed under the provisions of the act of the 30th of *March*, 1811? (5 *Sm. L.* 228. *Purd. Dig.* 690.) 2nd. Have they so proceeded? By the act of 1823, the power is not given to the auditor general singly. Reason and justice would seem to require, that debtors to the state, by assignment and transfer, should

(The Commonwealth *v.* Aurand.)

have means of protection equal with others.    But the express words of the act can leave no doubt.    The auditor general shall take *legal measures* for the collection of the fines, and shall settle and adjust the accounts of the marshals and deputy marshals, *under the provisions of the act of 30th of March*, 1811, entitled an act to amend, &c., and shall exercise the same powers as may be exercised in the case of *other debtors and delinquent officers of the commonwealth.* Then, have the terms of the act of 1811 been complied with?    The third section directs, that any public account *examined, adjusted, and entered, by the auditor general, shall, together with the vouchers and all other papers and information appurtenant thereto, be submitted to the state treasurer, for his revision and approbation; and, in order that the state treasurer may be enabled to revise and examine the accounts so submitted to him, he is hereby invested with powers similar to those vested in the auditor general by this act.*    The powers thus given to the state treasurer are mentioned in the second and fourth sections; and among them is the power to enforce the production of books, accounts, and documents, and the appearance of parties and witnesses on pain of imprisonment.    By the 12th section, "the balance due to the commonwealth, on every account settled agreeably to this act, shall be deemed and adjudged to be a lien from the date of the settlement of such account on all the real estate of the person or persons indebted, and on his or their sureties throughout this commonwealth."    By the 5th section it is made the duty of the state treasurer "to return such accounts, vouchers, &c., to the auditor general, within a reasonable time, signed *by him,* if *he* approve thereof; but if *he* disapprove of any account, *he* shall state, in writing, the reasons for such disapprobation; and if, upon reconsideration of the account so disapproved of by the state treasurer, the auditor general and state treasurer cannot agree, it shall be the duty of the auditor general to lay the account, and vouchers, and other papers appurtenant thereto, before the governor, together with his own reasons and the reasons of the state treasurer respecting the same; and the decision of the governor thereon shall be conclusive as to the said officers, &c."

Now, it appears that, in this case, the balance against *Aurand* is fixed, by the auditor general, and by *A. M. Piper,* for *William Clark,* treasurer, when it is not stated, nor can it be known judicially under what pretence of authority *A. M. Piper* acted.    The treasurer is appointed by the legislature.    There is no power of delegation in the act of assembly.    If he can thus be permitted to throw off his responsibility, the auditor general may do the same; and, if this is lawful, two of the clerks in the office may enter a judgment, binding upon the real estate of every debtor, or supposed debtor, and their sureties, throughout the commonwealth.    If the two clerks happen to differ in opinion, is the governor to be called on to settle the dispute between them, and may he also delegate his authority to another?    Here the act to be done required talent, knowledge, responsi-

(The Commonwealth *v.* Aurand.)

bility. If to pronounce a judgment binding upon real estate through-- out the commonwealth, *ex parte* in some cases, and without appeal in others, is not a judicial act, it will be difficult to name an official act which cannot be performed by deputy or substitute. The rules of law on the subject will hardly be contested. *A judicial officer cannot make a deputy, because his judgment is relied on.* 5 *Bac. Ab.* Offices and *Officers, L. All holding judicial authority must hold their courts in their proper persons, and cannot depute, nor in any way transfer their power to another. Ibid. A coroner cannot make a deputy, nor an escheator, because they are judicial offices, which they must exercise in person. Ibid. Justices of the peace cannot delegate a certain number of themselves, and invest them with a power to make rates and orders. Ibid. One holding the office of clerk of the papers cannot make a deputy; for it requires knowledge and skill.* 16 *Vin. Ab.* title *Officer, J.* 11. *An office which concerns the king's revenue, cannot be executed by deputy. Ibid.* 12. *Sheriff must execute a writ of partition, in person; so a writ of inquiry of waste, admeasurement of dower, and writ of re-disseisin; for he is in loco judicis.* 6 *Bac. Ab.* Sheriff, *H.* 3.

*Smith* and *Buchanan,* for the commonwealth.—Under the act of 1823, no approbation of the state treasurer was necessary to this settlement of *Aurand's* account. If it was necessary, such approbation has here been sufficiently given in the name of *A. M. Piper,* chief clerk. The state treasurer is not mentioned in the act of 1823. By this act all the powers vested, by the law of 1811, in the three officers, including the governor, are conferred on the auditor general alone. But, supposing further approbation to have been necessary, here it has been given. By the same act of 1811, sect. 42, in case the state treasurer shall die during the recess of the legislature, the chief clerk in the treasurer's office, having taken the oath or affirmation of office, and given the requisite security, shall be authorized to do the duties of state treasurer, until another shall be appointed by the legislature. The authorities cited against us are, some of them, not applicable, and some of them are not law in *Pennsylvania.* Who here ever doubted whether a coroner can appoint a deputy? We have a common law of our own, which has grown up with the growth of the state. *Commonwealth v. Greason,* 5 *Serg. & Rawle,* 333. A deputy clerk of the peace may administer the oath on registering a slave. In *Reigart v. M'Grath,* 16 *Serg. & Rawle,* 65, a deputy of the clerk of the Mayor's Court administered the oath on the appeal, and it was held good. In the commonwealth for use of *Allen* v. *Finney,* at the last term of this court, in this place, it was decided, that a recognizance, taken by a mere clerk in the office, was valid; yet taking a recognizance is called a judicial act. 1 *P. Wms.* 334. The deputy prothonotary appoints arbitrators, taxes bills of costs, enters judgments. The mode of settling public accounts, adopted in this case, has been in use for

(The Commonwealth *v.* Aurand.)

a series of years. It is a practice dictated, not by convenience only but by necessity. The doctrine, and the reason for it, is fully developed, by the Chief Justice, in *Reigart* v. *M'Grath*, 16 *Serg. & Rawle*, 65. And the same necessity has produced a similar change in *England.* There, even as to sheriffs, it is admitted to be impossible that the high sheriff should execute every duty personally, and that therefore the deputy must have the same powers. He may make bills of sale, return executions and other writs, and, generally, do every thing which the sheriff himself can do. 6 *Bac. Ab. Sheriff, H.* 3. And *per* Lord MANSFIELD, a mere clerk of the deputy was permitted to make a valid assignment of a bail bond, where it appeared that such was the usual practice. *Ibid:* A deputy sheriff may hold an inquest of damages. 2 *Johns. Rep.* 63. Now, if arguments of convenience and necessity apply to the offices of prothonotary and sheriff, they apply much more forcibly to the present case. The operations of government may be stopped upon the rules of strictness here insisted on. Except fixed salaries, no money could be paid, and none received, at the public treasury, in case of sickness or absence of the auditor general or treasurer. Though it is believed, in point of fact, that the treasurer never investigates an account, or examines the vouchers, unless for some special reason, or unless the party implicated makes objections, yet we contend that if his duty required him to investigate, in this case such duty will be presumed to have been done. The entry by another hand will be supposed to have been by directions of the chief officer till the contrary appears. Here the account has been returned to the auditor general from the treasury office, which implies the approbation of the treasurer. Besides, there is no appeal by *Aurand:* no application to correct mistakes, which, by the act of 1811, might have been done within a year if any mistakes existed. That to settle an account requires discretion is admitted: that it is a judicial act is denied. These officers give security for performance of their duty; which is never given by judges. No one has heard of a judicial officer, in case of death, being succeeded by the chief clerk. If the deputy or substitute does any thing injurious, the principal shall answer. 5 *Bac. Ab. Offices, L.*

*Baird,* for the defendant, in reply.—The operations of government will not be interfered with by a reversal. It is not a question about a payment due by the commonwealth to an individual. It is the case of a very high and extraordinary judicial power delegated to those who are not otherwise judicial officers: a power claimed to pronounce a decree, *ex parte,* binding and conclusive, and which is to be incontrovertible by any evidence whatever, and a lien from its date throughout the commonwealth, not only upon the party who may, perhaps, have had notice, but upon his sureties, without the least pretence of notice to them. The question is, whether such decree can be given except by those to whom the power is expressly and exclusively given by the act of assembly.

, (The Commonwealth *v.* Aurand.)

Suppose in fact, what does not appear, nor is attempted to be shown, that the state treasurer was disabled by sickness or otherwise from deciding. personally. in this case, still we contend that the special and great prerogative of obtaining a judgment without a trial, must be exerted in the manner and under the conditions prescribed by the legislature: otherwise the commonwealth must be content with the usual remedy of suing in the courts of law. The sentence of the auditor general alone, can create no lien. The 42d sect. which has been relied on, enabling the chief clerk to act upon the death of the treasurer, upon taking the oath of office and giving security, proves that such death, oath, and security, are necessary to qualify him to act at all as state treasurer. Costs are given by the law. and the judgment of the court: and because the clerk of the prothonotary may tax the bill, it will hardly follow that he may give judgment by default, for debt and costs both, under pretence that the judge cannot be upon the bench. We deny the existence of any necessity for pronouncing a summary judgment against a supposed debtor to the state, by any officer or clerk not authorized. The counsel for the commonwealth seem not much to have relied on the act of 1823, as giving the power to the auditor general alone. That act expressly directs the accounting *officers* to give credit, &c. It declares in so many words, that the proceedings shall be under the act of 1811. The officers in this case have affected to act throughout under the act of 1811, except that another person, without any authority has undertaken to decide the cause and pronounce the decree, instead of the treasurer, who was assigned by the law to that duty. A copy of the account has been given in evidence under the act of 1811. Interest after three months, is charged under the act of 1811. A priority of lien upon *Aurand's* land is asked for and enforced under the same act; no other law exists giving such priority. Practice and usage in the offices have been mentioned. Without admitting any such usage, we say if such usage exists, it is as directly against every principle of justice, as it is against the words of the law, and ought to be abolished. But we deny the usage itself. No instance is shown of an attempt previous to this case, to enforce a judgment against a public debtor rendered by the auditor general and a clerk of the treasurer.

GIBSON, C. J., delivered the opinion of the court.

I consider the point made here as already determined, there being no difference between the present case and *Reigart v. M'Grath,* except that the necessity which dictated the practice there was not near so urgent. Were the powers of the treasurer limited to a discharge of his duties in person, the whole fiscal concerns of the government would suffer derangement: an evil not to be endured. The existing practice is shown to be coeval with the constitution; and if the legislature, having the appointment of the officer committed to it, and the superintendance of his business peculiarly with-

(The Commonwealth *v.* Aurand.)

in its province, has thought fit to acquiesce, it would be an unwarrantable exercise of power in favour of a supposed theoretic principle, for this court to declare settlements like the present void, and thus impair the title of the state to millions received or secured, through their instrumentality. There is, however, no principle with which the practice is not in strict accordance. The adjustment of an account is no further judicial than the taxation of a bill of costs, which may, unquestionably, be by the prothonotary's clerk. In regard, however, to the militia fines transferred by the act of congress, passed the 4th of *May*, 1822, it is perfectly clear that the auditor general is not, as has been contended, exclusively the officer to settle the accounts. By the act of assembly passed the 1st of *April*, 1823, the accounts are subjected to all the provisions of the general law of 1811; but the allowance of the account by the treasurer being unquestionably valid in this particular instance, there is no pretence for sending the cause to another jury.

ToD, J., dissented.

Judgment affirmed.